# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRAMAR RETAIL CENTERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12875-VCL |
| | ) | |
| MARION #2-SEAPORT TRUST U/A/D | ) | |
| JUNE 21, 2002 | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 7, 2018
Date Decided:  December 4, 2018

Kenneth J. Nachbar, Lauren Neal Bennett, Coleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard A. Heller, PROCOPIO, CORY, HARGREAVES & SAVITCH LLP, San Diego, California; *Attorneys for Plaintiff Terramar Retail Centers, LLC*.

Thad J. Bracegirdle, WILKS, LUKOFF & BRACEGIRDLE, LLC; Ben D. Whitwell, Melissa C. McLaughlin, VENABLE LLP, Los Angeles, CA; *Attorneys for Defendant Marion #2-Seaport Trust U/A/D/ June 21, 2002*.

**LASTER, V.C.**

Plaintiff Terramar Retail Centers, LLC filed a motion *in limine* to address extreme positions taken in discovery by defendant Marion #2-Seaport Trust U/A/D June 21, 2002 (the "Trust"). Terramar framed its filing as a motion *in limine* because of the form of relief Terramar seeks: an order precluding the Trust from introducing evidence at trial on matters where the Trust refused to provide discovery. While the motion was pending, the Trust engaged in discovery misconduct by selectively producing a limited number of documents by the deadline for substantial completion of production, then dumping twenty-two times that amount on Terramar just ten days before the discovery cutoff while promising even more documents to come. Heightening the abusive nature of its actions, the Trust's document avalanche hit just after Terramar completed the key deposition in the case: the Rule 30(b)(6) deposition of the Trust, given by its principal Michael Cohen. The Trust's actions prevented Terramar from using any of the documents during the deposition.

Throughout this litigation, the Trust has engaged in serial efforts to delay this case. The Trust has deployed these tactics both for litigation advantage and to gain leverage in the underlying business dispute, which involves the dissolution of an entity and the sale of its assets. This litigation makes a sale of assets problematic, providing the Trust with holdup value.

After taking into account the Trust's conduct as a whole, I believe a serious sanction is warranted. I have weighed Terramar's request for an evidence-preclusion order against more onerous sanctions, such as a default judgment, adverse factual determinations, adverse inferences, or modifications to the burden of proof. I have also weighed Terramar's request for an evidence-preclusion order against the milder remedy of postponing the trial

1

now set for January 2019 and granting a re-do of the discovery process. Although I believe that the Trust's conduct could have warranted a more serious sanction, I will not impose anything more than what Terramar has requested. A lesser sanction would not be a sufficient consequence for the Trust's misconduct. To the contrary, it would reward the Trust for its pattern of behavior by granting the Trust the delay it has sought all along.

This decision therefore grants Terramar's motion *in limine*. It also awards Terramar the expenses it incurred pursuing this motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the pleadings and the submissions made in connection with Terramar's motion. Because this is a discovery ruling, the description of events provided in this section does not constitute formal findings of fact. It only represents how the record appears at this preliminary stage.

### A. Seaport Village And The Company

Seaport Village is a specialty shopping center and tourist attraction in San Diego, California. The Port of San Diego owns the land where Seaport Village sits.

In 1978, non-party San Diego Sea Port Village, Ltd. ("Limited") entered into a forty-year lease with the Port for the Seaport Village property. To finance the development of Seaport Village, Limited borrowed $40 million from Yasuda Trust & Banking Co. Ltd.

In 1998, Limited defaulted on the Yasuda loan. In 2000, Limited's affiliate, San Diego Seaport Lending Co., LLC ("Lending"), bought the Yasuda loan for approximately $25 million. Cohen helped Limited finance the purchase. As consideration for his services, a Cohen-affiliated entity received a 50% interest in the net cash flows of Limited and

2

Lending, plus a 50% interest in the net proceeds from any sale of those companies. Through this structure, Cohen obtained the cash flow rights associated with a 50% equity interest in Limited and Lending but without taking a formal ownership stake.

By 2002, the Seaport Village project needed more financing. Cohen and Limited approached Terramar, which owns and operates commercial real estate.[1] As part of a larger financial restructuring of the project, the parties formed a Delaware limited liability company named Seaport Village Operating Company, LLC (the "Company"). The business and affairs of the Company are governed by its operating agreement dated September 1, 2002 (the "Operating Agreement").

As part of the restructuring, Limited subleased the land for Seaport Village to the Company and received a 50% member interest. Limited allocated half of this interest (25%) to Cohen in accordance with the effective split of the cash-flow rights from Limited and Lending. To hold his 25% member interest, Cohen formed the Trust. Under the Operating Agreement, Cohen received an exclusive right to broker any future financing for the Seaport Village project.[2]

Terramar made a capital contribution of $7 million to the Company, guaranteed half of Lending's outstanding loan, took over the management of Seaport Village, and agreed to seek to renew the lease with the Port and to attempt to obtain a lease for an adjacent

---

[1] At the time, Terramar was known as GMS Realty. For simplicity, this opinion refers to the entity as "Terramar."

[2] *See* Operating Agreement § 5.4(b).

3

property. In return, Terramar received 50% of the member interests in the Company. Terramar also became sole manager of the Company, with "full, exclusive, and complete discretion to manage and control the business affairs of the Company . . . ."[3]

Terramar obtained two additional rights under the Operating Agreement. First, Terramar obtained the right to receive a preferential return of 11.5% per year on its capital contribution of $7 million before the Company could make any *pro rata* distributions to its members.[4] Second, Terramar received the right to request that the other members buy out its member interest at fair market value at any time after January 1, 2006 (the "Put Right"). To give teeth to the Put Right, Terramar received the right to dissolve the Company and receive a contractually determined payout if the members did not purchase Terramar's interest within six months (the "Dissolution Right").[5]

## B. Disputes Arise.

Over the years, the Company's members have disagreed about a variety of matters. In April 2012, Limited sued Terramar in the Superior Court of the State of California for the County of San Diego, seeking the dissolution of the Company. In August 2013, that court held that any claim for dissolution must be brought in Delaware.

In August 2013, Limited sued Terramar in this court (the "Limited Action"). Limited alleged that Terramar breached the Operating Agreement by failing to act

---

[3] *Id.* § 5.1(a).

[4] *See id.* § 4.1.

[5] *Id.* § 9.5(d).

4

diligently to obtain an extension of the Seaport Village lease and the lease on an adjacent property. Limited also alleged that Terramar breached the Operating Agreement by providing first-party financing to the Company and wrongfully allocating income to Limited. The Trust was not a party to the Limited Action.

On November 9, 2015, this court rendered its post-trial decision in the Limited Action, which ruled in favor of Terramar on all claims. Limited appealed. By order dated September 26, 2016, the Delaware Supreme Court affirmed this court's decision, bringing the Limited Action to a close.

## C.    Terramar Exercises The Put Right.

On December 18, 2015, Terramar exercised the Put Right. Under the Operating Agreement, the exercise notice had to specify (i) Terramar's assessment of the Company's fair market value ("Fair Market Value") and (ii) Terramar's calculation of a contractually determined purchase price for Terramar's interests (the "Put Price"). A key component of the Put Price was the amount Terramar would receive under the waterfall distribution provisions in the Operating Agreement if all of the Company's assets were sold for an amount equal to Fair Market Value (the "Waterfall Amount"). Terramar's exercise notice specified a Fair Market Value of $42,932,927 and a Put Price of $55,445,552.[6]

---

[6] Dkt. 70, Ex. B at 3.

5

Both the Trust and Limited disputed Terramar's calculation of Fair Market Value. By doing so, they triggered a contractual valuation procedure spelled out in the Operating Agreement. The procedure resulted in a Fair Market Value of $57,503,287.

The Operating Agreement did not contain a mechanism for resolving other disputes over the Put Price. Both Limited and the Trust contended that Terramar had misapplied the distribution provisions when calculating the Waterfall Amount.

Under the Operating Agreement, once the Put Price was set, the other members had six months to buy out Terramar's interest at that price. If they did not, then Terramar could exercise the Dissolution Right. As part of the dissolution process, Terramar could sell the property and assets of the Company "on such terms and conditions as [Terramar] determined in its sole and absolute discretion," except for sales to controlled affiliates of Terramar, where other contractual restrictions would apply.[7]

The six-month period expired on November 9, 2016. Terramar never received the Put Price.

## D.    This Litigation

On November 4, 2016, Terramar filed this action against Limited and the Trust. Terramar sought a declaration that it was entitled to dissolve the Company, could sell the Company's assets unilaterally to a third party as part of that process, and had correctly calculated the Waterfall Amount. The parties agreed to extend the response date until

---

[7] Operating Agreement § 9.5(d).

January 6, 2017. When that date arrived, the Trust moved to dismiss, contending that this court could not assert jurisdiction over the Trust and that Terramar's lawsuit was not ripe.

In lieu of responding, Limited entered into a further stipulation with Terramar that extended its response date. Shortly thereafter, Limited sold its 25% interest in the Company to Terramar. As a result, Terramar and the Trust became the only remaining members of the Company.[8] Terramar stipulated to the dismissal of Limited from this action with prejudice.

### E. The Trust's Motions To Dismiss

On February 10, 2017, Terramar filed the currently operative complaint. On February 24, the Trust moved to dismiss, again disputing the existence of personal jurisdiction and contending that the litigation was not ripe. That same day, Terramar served its first set of document requests (the "First Requests").

On March 27, 2017, the Trust moved to stay discovery pending a decision on its motion to dismiss. The parties stipulated to a stay of discovery with an exception for requests for admissions.

Oral argument on the motion to dismiss was scheduled for July 18, 2017. On the day before the oral argument, the Trust filed a competing action against Terramar in the

---

[8] The Trust disputes the effect of the sale. Terramar contends that it became the owner of Limited's interests, giving it a 75% ownership stake in the Company. The Trust contends that Terramar's interest and its interest increased proportionately, such that Terramar currently owns two thirds of the member interests in the Company and the Trust owns one third. *See* Answer ¶ 1.

Superior Court of the State of California for the County of Los Angeles. In that action, the Trust asserts that Terramar breached its fiduciary duties, violated the implied covenant of good faith and fair dealing, and failed to comply with Section 5.10(a) of the Operating Agreement. The Trust seeks declarations that (i) Terramar's conduct forecloses it from exercising the Put Right or the Dissolution Right; (ii) Section 5.6 of the Operating Agreement requires 75% of the member interests to approve any sale of a substantial portion of the Company's assets; (iii) Terramar owns two thirds of the member interests and the Trust owns one third; and (iv) the Trust's competing interpretation of the waterfall provisions is correct.[9]

Even after filing the California action, the Trust did not formally withdraw its ripeness argument. Counsel argued instead at the hearing that the existence of the California action provided a new reason to dismiss the case.[10] According to the Trust, "whether it's a question of ripeness of a question of judicial comity, this case should be dismissed and the parties should be allowed to resolve their dispute in California."[11]

On August 18, 2017, I issued a memorandum opinion denying the Trust's motion.[12] The Trust moved for reargument, which I denied. The Trust then moved for certification

---

[9] *See* Dkt. 70, Ex. A at 26.

[10] *See* Dkt. 46, at 27.

[11] *Id.* at 29.

[12] *See Terramar Retail Centers, LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712 (Del. Ch. Aug. 18, 2017).

of an interlocutory appeal on the question of personal jurisdiction. I granted the application, and the Delaware Supreme Court accepted the appeal. By order dated April 20, 2018, the Delaware Supreme Court agreed that this court could exercise personal jurisdiction over the Trust.

At that point, the Trust might have been expected to finally answer the complaint. It didn't. Instead, on May 22, 2018, the Trust moved to dismiss or stay this case, claiming that the doctrine of *forum non conveniens* required deference to the second-filed California action. The Trust thus formally asserted as a second pleadings-stage motion exactly the same argument that its counsel had made eleven months earlier during the hearing on the Trust's first motion to dismiss.

Terramar attempted to engage in discussions with the Trust about beginning discovery. As Terramar saw it, the parties were going to litigate somewhere, and the parties should start litigating. The Trust disagreed, refused to discuss a schedule, and contended that the Delaware case should remain in suspension until the court decided the Trust's second pleadings-stage motion to dismiss.

Understandably perceiving the Trust's motion as a delay tactic, Terramar sought entry of a scheduling order. After receiving the Trust's opposition, I held a hearing at which the parties presented argument.

On June 14, 2018, I entered a scheduling order substantially in the form requested by Terramar. Because the case had been stalled long enough and presented what appeared

to be straightforward issues of contract interpretation, I scheduled trial for January 23–24, 2019.[13] To facilitate preparation for trial, the scheduling order set the following deadlines:

- June 28, 2018: The Trust answers the complaint, without prejudice to its then-pending motion to dismiss or stay.

- August 31, 2018: Substantial completion of document production in response to requests served on or before July 20, 2018.

- October 26, 2018: Completion of all fact discovery, including party and third-party depositions (except for any fact discovery subject to a motion to compel or motion for protective order pending on this date).

As revealed by subsequent events, the Trust did not comply in good faith with the scheduling order. It set out to evade the order.

## F.     The Discovery Requests And Responses

On June 28, 2018, the Trust answered the complaint. It did not file any counterclaims. In its answer, the Trust purported to

> reserve[] the right, pursuant to Court of Chancery Rules 13 and 15, to amend this pleading in the event such amendment may be necessary pursuant to the terms of any Order entered by the Court that determines the issues to be litigated in this action. While the Court already has held that claims will proceed in the California Action, the Cohen Trust specifically, and without limitation, reserves the right to amend this pleading to assert in this action, as a counterclaim and/or affirmative defense, any rights or claims currently asserted in the California Action if necessary pursuant to an Order entered by the Court after the filing of this pleading.[14]

By letter dated July 10, 2018, Terramar objected that "[t]he Trust's claimed unilateral right to assert counterclaims at some indeterminate point in the future violates the compulsory

---

[13] *See* Dkt. 73, at 13–15.

[14] Answer at 26.

10

counterclaim rule (Court of Chancery Rule 13(a)) and appears to be a deliberate attempt to use self-help to nullify the case scheduling order."[15]

On July 13, 2018, Terramar served its second set of document requests (the "Second Requests"). The scheduling order had set August 31, 2018, as the date for substantial completion of the production of documents responsive to any requests served before July 20, 2018. Accordingly, that deadline covered both the First Requests and the Second Requests.

On July 23, 2018, Terramar served a third set of "cleanup" document requests (the "Third Requests").[16] Having reviewed all three sets of Terramar's document requests, I find it hard to believe that there are many documents responsive to the Third Requests that are not also responsive to the First or Second Requests. Nevertheless, the Third Requests were technically not covered by the deadline for substantial completion of document production.

On August 10, 2018, the Trust served its responses and objections to the Second Requests. The Trust refused to produce documents addressing numerous positions the Trust had taken in its answer or raised through its affirmative defenses.

For example, the scope of Section 9.5 of the Operating Agreement is obviously at issue in the case. That section contains both the Put Right and the Dissolution Right. It also

---

[15] Dkt. 71, at 3–4.

[16] *See* Dkt. 122, at 23.

11

sets forth the procedure for determining Fair Market Value. In its answer, the Trust contended that Terramar had not properly invoked its rights under Section 9.5.[17] The Trust also asserted as an affirmative defense that Terramar was guilty of unclean hands because its conduct "frustrated the intent" of Section 9.5.[18]

Because the Trust had taken these positions, Terramar requested "[a]ll documents, regardless of when created, relating to Section 9.5 of the Operating Agreement."[19] Despite having taken these positions, the Trust said that it "will not produce documents in response to this request."[20] Then, to obfuscate this seemingly clear refusal, the Trust immediately added that "non-privileged documents 'relating to Section 9.5 of the Operating Agreement' may be produced as responsive to other requests."[21] The Trust did not identify what other requests it was referring to or explain whether this meant that it was in fact producing responsive documents.

Along similar lines, because the Trust was contending that Terramar had misinterpreted the Dissolution Right, Terramar requested "[a]ll Documents, regardless of when created, relating to the proceeds of dissolution to which Terramar is entitled pursuant

---

[17] *See* Answer ¶¶ 18–20.

[18] *Id.* at 24–25.

[19] Dkt. 90, Ex. D at 13–14.

[20] *Id.*

[21] *Id.*

to Section 9.5(d) of the Operating Agreement."[22] The Trust refused to produce documents, claiming that the request "assume[d] a hypothetical 'dissolution . . . pursuant to Section 9.5(d) of the Operating Agreement' that has not occurred."[23] Yet by contesting Terramar's exercise of the Dissolution Right, including the resulting proceeds, the Trust necessarily had taken a position regarding what was supposed to happen in precisely that dissolution. This objection was not asserted in good faith.

In a parallel request, Terramar asked for "[a]ll Documents, regardless of when created, relating to proceeds of dissolution to which The Cohen Trust is entitled pursuant to Section 9.5(d) of the Operating Agreement."[24] The Trust again refused to produce documents, claiming again that the request "assume[d] a hypothetical 'dissolution . . . pursuant to Section 9.5(d) of the Operating Agreement' that has not occurred."[25] The Trust obviously had a view about what it was supposed to receive, because it was disputing Terramar's exercise of the Dissolution Right and its calculations. Once again, this objection could not have been asserted in good faith.

The Trust took similarly unfounded positions in response to requests relating to Section 4.1 of the Operating Agreement. That section governs the calculation of the

---

[22] *Id.* at 15.

[23] *Id.*

[24] *Id.*

[25] *Id.*

13

Waterfall Amount, and the Trust disputes Terramar's calculation.[26] Because of this dispute, Terramar requested "[a]ll Documents, regardless of when created, relating to the rights of any member of [the Company] under the Waterfall."[27] In response, the Trust deployed its obfuscatory refusal, saying that it "will not produce documents in response to this request, although non-privileged documents 'relating to the rights of any member of [the Company] under the Waterfall' may be produced as responsive to other requests."[28]

Because the Trust was disputing the calculation of the Waterfall Amount, Terramar requested "[a]ll Documents, regardless of when created, relating to the Waterfall and/or distributions and/or the calculation of potential distributions, to members pursuant to the Waterfall provisions."[29] The Trust again asserted that it "will not produce documents in response to this request, although non-privileged documents 'relating to the Waterfall and/or distributions and/or the calculation of potential distributions, to members pursuant to the Waterfall provisions' may be produced as responsive to other requests."[30]

For similar reasons, Terramar asked for "[a]ll Documents, regardless when created, relating to the distribution of proceeds of dissolution" under Section 4.1(c).[31] The Trust

---

[26] Answer ¶ 24.

[27] Dkt. 90, Ex. D at 12–13.

[28] *Id.*

[29] *Id.* at 14.

[30] *Id.*

[31] *Id.* at 16.

14

responded that it "will not produce documents in response to this request, although non-privileged documents relating to distribution of proceeds pursuant to Section 4(c) of the Operating Agreement may be produced as responsive to other requests."[32]

The Trust even refused to answer requests related to its affirmative defense of unclean hands, in which the Trust contended that Terramar "refused to use [the Company's] excess net cash flow to pay down Terramar's purported 'priority' on its original $7 million investment . . . ."[33] To explore this contention, Terramar requested "[a]ll Documents constituting or relating to communications with any accountant, financial advisor, tax advisor or other person concerning distribution of funds, or potential distribution of funds, pursuant to the Operating Agreement."[34] The Trust responded that it "will not produce documents in response to this request, although non-privileged documents 'constituting or relating to communications with any accountant, financial advisor, tax advisor or other person concerning distribution of funds, or potential distribution of funds, pursuant to the Operating Agreement' may be produced as responsive to other requests."[35]

---

[32] *Id.*

[33] Answer at 23–24; *see also id.* at 24–25 (asserting same theory for equitable estoppel affirmative defense).

[34] Dkt. 90, Ex. D at 17–18.

[35] *Id.*

In a final example, Terramar's complaint described the Put Right and Dissolution Right. The Trust denied those allegations, responding, "To the extent Paragraph 3 purports to describe the terms of the Operating Agreement, Defendant respectfully refers to that document for the true and correct contents thereof. Defendant otherwise denies the allegations of Paragraph 3."[36] To explore this denial, Terramar sought "[a]ll Documents, regardless of when created, concerning Defendant's denial, in Paragraph 3 of the Answer . . . ."[37] The Trust refused to produce documents, citing non-substantive general objections and claiming that the request "misstates the averments of Defendant's Answer. Defendant will not produce documents in response to this request."[38]

These are only examples. The Trust deployed similar responses throughout its responses to Terramar's discovery requests. At the same time, in its general objections, the Trust purported to "reserve[] the right to revise, amend or supplement the objections and responses set forth herein, and/or to withhold production of documents in response to the Request[s], following the Court's resolution of Defendant's Motion to Dismiss or Stay."[39] This objection made little sense, because parties are not entitled to grant themselves unilateral stays of discovery. It also rendered the Trust's responses meaningless, because the Trust was claiming it would revise them with impunity at a later date.

---

[36] Answer ¶ 3.

[37] Dkt. 90, Ex. D at 12.

[38] *Id.*

[39] *Id.* at 3–4.

16

**G.    The Trust's Efforts To Substantially Complete Its Document Production**

By order dated August 23, 2018, I denied the Trust's second pleading-stage motion to dismiss. On August 24, Terramar noticed the Rule 30(b)(6) deposition of the Trust for September 10. Because the substantial completion deadline was August 31, Terramar reasonably expected to receive a meaningful production from the Trust in time to prepare for the deposition.

Instead, the Trust sought to delay again. On August 30, 2018, the Trust moved for reargument of the order denying the motion to dismiss, marking the third time that the Trust had argued that this case should be stayed in favor of the California action. The Trust also asked the court to amend the scheduling order and proposed a new schedule that would result in trial at some point after July 2019. As part of its request, the Trust contended that it should be permitted to amend its answer to assert counterclaims that it had not previously asserted.

The next day was August 31, 2018, the date for substantial completion of the production of documents. As of that point, the Trust had produced only 297 documents, representing a total of 1,367 pages. By contrast, Terramar had produced 27,162 documents.

Terramar opposed the Trust's motion for reargument and resisted its effort to reset the entire schedule and replead its case. Moreover, with the deadline for substantial completion having passed, and with the Trust having taken extreme positions in its written discovery responses, Terramar filed the motion *in limine* addressed in this decision. Through that motion, Terramar sought to force the Trust to live by the consequences of the positions it had taken during discovery.

17

By order dated September 19, 2018, I denied the motion for reargument and directed the parties to prepare for trial. As that order explained, the scheduling order established June 28, 2018, as "a clear and specific date for the Trust to answer, raise affirmative defenses, and assert any counterclaims or third-party claims."[40] When the Trust filed its answer and asserted affirmative defenses, it "made a tactical decision not to assert counterclaims. That was the Trust's choice, and the Trust must live with it."[41]

## H. The Document Dump

Because of the Trust's resistance, the Rule 30(b)(6) deposition that Terramar had noticed for September 10, 2018, did not take place until October 16, ten days before the close of fact discovery. Cohen served as the Trust's Rule 30(b)(6) witness. After the deposition, the Trust produced 31,431 pages of electronic documents—*twenty-two times* what the Trust had produced by the substantial completion date. The Trust also said it would produce another twenty to thirty boxes of hardcopy documents, equating to approximately 50,000 to 90,000 additional pages. Taking the lower end of the range, the Trust produced just 1.6% of its documents by the substantial completion deadline.

On October 24, 2018, the Trust sought leave to file an amended answer and counterclaims. That motion sought to reargue the court's prior scheduling decision, which was law of the case. It is addressed by separate order.

---

[40] *Terramar Retail Centers, LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2018 WL 4510425, at *1 (Del. Ch. Sept. 19, 2018) (ORDER).

[41] *Id.*

## II.   LEGAL ANALYSIS

Terramar has filed a motion to address the Trust's discovery abuse. Because Terramar seeks an evidence-preclusion order, Terramar styled its filing as a motion *in limine*. The Trust has argued that because of Terramar's chosen appellation, the court should defer the issues it raises until trial. In my view, the title of Terramar's motion does not undermine this court's ability to address the Trust's discovery misconduct.

The Delaware Supreme Court has made clear that "[d]iscovery abuse has no place in our courts . . . ." [42] The high court has admonished that "the protection of litigants, the public, and the bar demands nothing less than that [Delaware] trial courts be diligent in promptly and effectively taking corrective action to 'secure the just, speedy and inexpensive determination of *every* proceeding' before them."[43]

The Delaware Supreme Court "has long recognized that the purpose[s] of discovery [are] to advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial."[44] "Candor and fair-dealing are, or should be, the hallmark of litigation

---

[42] *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984).

[43] *Id.*

[44] *Levy v. Stern*, 687 A.2d 573, 1996 WL 742818, at *2 (Del. Dec. 20, 1996) (TABLE); *see McCaffrey v. City of Wilmington*, 2014 WL 598030, at *3 (Del. Super. Jan. 31, 2014) ("The days in which surprise was an acceptable way of proceeding in civil litigation are long over.").

and required attributes of those who resort to the judicial process. The rules of discovery demand no less."[45]

"Scheduling orders and discovery cutoffs further these important purposes and policies by ensuring that parties provide discovery in a timely fashion, thereby avoiding trial by surprise and the prejudice that results from belated disclosure."[46] "Parties must be mindful that scheduling orders are not merely guidelines but have the same full force and effect as any other court order."[47]

"Generally speaking, Delaware courts strictly adhere to discovery cut-off dates."[48] "A party that disregards the provisions in a scheduling order that govern discovery is engaging in discovery abuse. If a party cannot meet a deadline, the onus is on that party to be forthcoming and transparent about the situation and the reasons for it."[49]

---

[45] *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999).

[46] *IQ Hldgs., Inc. v. Am. Commercial Lines, Inc.*, 2012 WL 3877790, at *2 (Del. Ch. Aug. 30, 2012).

[47] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1238 (Del. 2012) (alterations and internal quotation marks omitted); *accord Sammons v. Doctors for Emergency Servs., P.A.*, 913 A.2d 519, 528 (Del. 2006).

[48] *In re ExamWorks Gp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at *6 (Del. Ch. Feb. 21, 2018); *accord IQ Hldgs.*, 2012 WL 3877790, at *2; *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1994 WL 682420, at *3 (Del. Ch. Nov. 17, 1994).

[49] *ExamWorks*, 2018 WL 1008439, at *6; *accord Froot Family Ltd. P'ship v. Mainstreet Asset Mgmt., Inc.*, 2018 WL 6068437, at *1 (Del. Ch. Nov. 16, 2018) (ORDER).

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders."[50] The sanctions imposed must be "just and reasonable."[51] "Generally, sanctions are intended for one or more of three purposes: punishment, deterrence or coercion."[52] "Trial courts should be diligent in the imposition of sanctions upon a party who refuses to comply with discovery orders, not just to penalize those whose conduct warrants such sanctions, but to deter those who may be tempted to abuse the legal system by their irresponsible conduct."[53]

Court of Chancery Rule 37(b)(2) provides an "arsenal" of possible sanctions that a trial court can impose for discovery violations.[54] The options include:

---

[50] *Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at \*2 (Del. Nov. 6, 2007) (TABLE); *see Genger v. TR Inv'rs*, 26 A.3d 180, 190 (Del. 2011) ("A trial court has broad discretion to fashion and impose discovery sanctions.").

[51] *Gallagher*, 2007 WL 3262150, at \*2.

[52] *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990).

[53] *Holt*, 472 A.2d at 824; *see also Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 99 (D.N.J. 2006) ("[Rule 37's] purposes are to: (1) penalize the culpable party or attorney; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for the expense caused by the abusive conduct; and (4) compel discovery and disclosure."). Because the Court of Chancery Rules are patterned on the Federal Rules of Civil Procedure, it is appropriate to look to federal authorities for guidance. *See Plummer v. Sherman*, 861 A.2d 1238, 1242 (Del. 2004).

[54] *See Rinehardt*, 575 A.2d at 1083; *see also Crispin-Taveras v. Municipality of Carolina*, 647 F.3d 1, 7 (1st Cir. 2011) ("Federal Rule of Civil Procedure 37(b) gives the district court a 'veritable arsenal of sanctions' for failure to comply with discovery orders, including designating facts as established, striking pleadings, or rendering a default judgment."). *See generally* 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2281 (3d ed. 2010 & Supp. Sept. 2018) ("Without adequate sanctions the procedure for discovery would often be ineffectual. Under Rule 37, . . . any party or person who seeks to evade or thwart full and candid

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; [or]

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.][55]

A trial court also "has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's inherent power to manage its own affairs."[56] "The Court has wide latitude to fashion an appropriate remedy, but the remedy must be tailored to the degree of culpability of the [sanctioned party] and the prejudice suffered by the complaining party."[57] "The decision whether to impose sanctions, upon whom to impose

_____

discovery incurs the risk of serious consequences, which may involve imprisonment for contempt of court, an order that designated facts be taken to be established, an order refusing the delinquent party the right to support or oppose designated claims or defenses, striking out pleadings or parts of pleadings, rendering judgment by default, dismissal of the action or a claim therein, or assessment of expenses and attorney's fees." (footnotes omitted)).

[55] Ct. Ch. R. 37(b)(2)(A)–(C).

[56] *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1189 (Del. Ch. 2009) (citation and internal quotation marks omitted); *see Hoag v. Amex Assurance Co.*, 953 A.2d 713, 716–717 (Del. 2008) (noting court's authority to impose sanctions for discovery abuse under Rule 37 or pursuant to its "inherent authority").

[57] *Beard Research*, 981 A.2d at 1189–90; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) ("Because of their very potency, inherent powers must be exercised

22

them, and what sanctions to impose, will depend upon the facts and circumstances of each particular case, but it should always be viewed in light of the proper function which sanctions are intended to serve."[58]

Delaware Supreme Court decisions teach that the entry of a default judgment under Rule 37(b)(2)(C) is "*the ultimate sanction* for discovery violations and *should be used sparingly*."[59] "Judgment by default is, of course, the extreme remedy and generally speaking [Rule 37(b)(2)(C)] has been interpreted to require some element of willfulness or conscious disregard of the order before such a sanction is imposed."[60] On an extreme set of facts, the Delaware Supreme Court held that "[l]itigants who continually miss discovery deadlines . . . may not claim surprise by imposition of the ultimate sanction of dismissal."[61] A party cannot unilaterally hold up a case. "Trial courts must be afforded broad discretion

---

with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." (citation omitted)).

[58] *Rinehardt*, 575 A.2d at 1082.

[59] *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006); *see, e.g.*, *Hoag*, 953 A.2d at 718–719 (affirming grant of dismissal sanction and citing plaintiff's "repeated failures to comply with four court orders over the span of three years and his refusal to cooperate with opposing counsel").

[60] *Sundor Elec., Inc. v. E.J.T. Constr. Co., Inc.*, 337 A.2d 651, 652 (Del. 1975) (internal quotation marks omitted).

[61] *Wahle v. Med. Ctr. of Del., Inc.*, 559 A.2d 1228, 1233 (Del. 1989).

to fashion orders to expedite cases consistent with the administration of justice and the efficient disposition of their caseloads."[62]

"A less final but still serious discovery sanction is the entry of an order under Rule 37(b)(2)(A) that deems designated facts to be established or which draws an inference as to a particular issue that is adverse to the party that failed to comply with its discovery obligations."[63] "A more moderate but still significant discovery sanction is to alter the burden of proof on a particular issue, either by shifting it to the party that failed to comply with its discovery obligations or by increasing or decreasing the relevant standard."[64]

"More typical remedies for late production are to allow additional discovery or to preclude the use of the belatedly produced material."[65] "Late production provides grounds for excluding the evidence."[66] "Delaware decisions involving the 'sword and shield'

---

[62] *Id.*

[63] *James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *9 (Del. Ch. Dec. 5, 2014).

[64] *Id.* at *9.

[65] *ExamWorks*, 2018 WL 1008439, at *7; *see, e.g.*, *D.W. Burt Concrete Constr., Inc. v. Dewey Beach Enters., Inc.*, 2015 WL 1788741, at *2 (Del. Super. Apr. 16, 2015) (prohibiting introduction of evidence where party "failed to comply with the discovery response deadline that was stipulated to by court order"); *OptimisCorp v. Waite*, 2015 WL 357675, at *8–9 (Del. Ch. Jan. 28, 2015) (striking affidavit produced after fact discovery cutoff); *see also, e.g.*, *Concord Towers, Inc. v. Long*, 348 A.2d 325, 326 (Del. 1975) (finding that the trial court committed error by admitting evidence that a party introduced for the first time at trial). *See generally* 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2291 (3d ed. 2010 & Supp. Sept. 2018) (giving example of an "order prohibiting the delinquent party from introducing designated matters in evidence").

[66] *IQ Hldgs.*, 2012 WL 3877790, at *2.

concept have precluded a party from shielding evidence from an opposing party and then relying on the evidence at trial to meet its burden of proof on an issue central to the resolution of the parties' dispute."[67] "[A] court order precluding a party from introducing in evidence material that it did not divulge in discovery has been recognized as an effective method of encouraging compliance with discovery."[68] In deciding whether to exclude evidence, "the Trial Court must balance its duty to admit all relevant and material evidence with its duty to enforce standards of fairness and the Rules of Court."[69]

Terramar has requested an order precluding the Trust from introducing its belatedly produced evidence. That is a serious sanction, but one that is warranted on the facts of the case.

---

[67] *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 2011 WL 284989, at *3 (Del. Ch. Jan. 20, 2011); *see Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 & n.8 (Del. Ch. 2000) (Strine, V.C.).

[68] *Surg–O–Flex of America, Inc. v. Bergen Brunswig Co.*, 76 F.R.D. 654, 655 (D. Conn. 1977); *see, e.g.*, *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 84, 95–97 (D.D.C. 2009) (overruling objection to magistrate judge's decision to prohibit party from introducing documentary evidence to support certain arguments where party had repeatedly failed to comply with discovery orders); *Barker v. Bledsoe*, 85 F.R.D. 545, 549 (W.D. Okla. 1979) (prohibiting party "from using at trial any evidence, opinion, or inference arising from" subject matter where party "fail[ed] to answer interrogatories, actively conceal[ed] relevant and helpful information when answers were finally filed, and fail[ed] to supplement those paltry answers"); *see also, e.g.*, *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 397–98 (4th Cir. 2014) (affirming decision to exclude evidence produced just two months before trial where evidence was responsive to initial discovery requests and subject to initial disclosure requirements under the federal rules).

[69] *Concord Towers*, 348 A.2d at 326.

## A.    The Trust's Sanctionable Conduct

"In the usual litigation, the court need not resort to Rule 37 because counsel recognize their duty to permit discovery and, in a professional manner, regulate the progression of the lawsuit with minimal court intervention."[70] In this litigation, the Trust used delay tactics to grant itself relief that the court has denied repeatedly. The Trust moved to dismiss twice, and the second motion raised again an argument that the Trust had made the first time around. While the second motion was pending, the Trust refused to discuss a schedule and resisted the entry of a scheduling order. When the court entered a scheduling order that the Trust did not like, the Trust moved to amend it. When that motion was denied, the Trust turned to self-help. It produced a limited number of documents in reliance on inscrutable objections, thereby failing to make a substantial production as required by the court's order. The Trust then dumped 98.4% of its documents onto Terramar at the end of the discovery period and after Terramar had taken the key deposition in the case. After these events, the Trust moved for leave to file counterclaims that it should have filed with its answer in June. That motion essentially seeks reargument of the order denying the Trust's second motion for reargument.

The Factual Background describes the pertinent details, but certain discovery issues are worth stressing. First, as noted, Terramar served discovery requests that sought information about matters that are plainly relevant and which the Trust itself had placed at

---

[70] *State of Ohio v. Crofters, Inc.*, 75 F.R.D. 12, 20–21 (D. Colo. 1977).

issue through denials in its answer and by raising affirmative defenses. The Trust refused to produce documents in response to some of these requests. In response to others, the Trust appeared to refuse to produce documents, only to suggest that it might produce responsive documents pursuant to other requests.

The Trust's response to the twenty-sixth request in the Second Requests is representative. Terramar asked for "[a]ll documents, regardless of when created, relating to Section 9.5 of the Operating Agreement." As discussed in the Factual Background, the meaning, interpretation, and operation of Section 9.5 is unquestionably at issue. Yet the Trust responded as follows:

> In addition to the foregoing General Objections, Defendant objects to this request on the grounds that it is overbroad and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence in this action. Defendant further objects to this request on the grounds that it seeks documents Defendant produced previously to Plaintiff in response to a third party subpoena served in connection with the Prior Action and, therefore, the request is unduly burdensome and oppressive. The request is unduly burdensome and oppressive for the additional reason that it seeks production of documents "regardless of when created," and thus would require Defendant to collect and produce materials created over a period of more than sixteen years. *Defendant will not produce documents in response to this request, although non-privileged documents "relating to Section 9.5 of the Operating Agreement" may be produced as responsive to other requests.*[71]

These objections were improper.

"For an objecting party to carry its burden, the objection must be specific, the party making it must explain why it applies on the facts of the case to the request being made,

---

[71] Dkt. 90, Ex. D at 13–14 (emphasis added).

27

and if the party is providing information subject to the objection, the party must articulate how it is applying the objection to limit the information it is providing."[72] Terramar's document request sought relevant information. There is nothing wrong with objecting to a request's scope, but the Trust was obligated to say what it was going to provide.

"It is particularly evasive for a response to recite broad, generic, and formulaic objections, then purport to answer 'subject to the objections.' Such a response makes it impossible to determine what information a party has agreed to provide and whether the response is complete . . . ."[73] The Trust's objection is even more evasive than the commonly asserted alternative of producing "subject to the objections." The Trust took the position that it would not produce any documents in response to the request but that it might produce some in response to other unspecified requests. That is the equivalent of a refusal to produce.

Second, the Trust produced a minimum quantum of documents by the substantial completion date: 297 documents, representing a total of 1,367 pages. Approximately six weeks later, just ten days before the discovery cutoff and after the key deposition in the case, the Trust produced another 31,431 pages of electronic documents. The Trust also said it would produce another twenty to thirty boxes of hardcopy documents, equating to approximately 50,000 to 90,000 additional pages. Taking the lower end of the range, the

---

[72] *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *3 (Del. Ch. Mar. 13, 2017).

[73] *Id.* at *2.

Trust produced 98.4% of its documents weeks after the date imposed for substantial completion of production and days before the discovery cutoff. A production comprising 1.6% of the producing party's documents is not substantially complete.

Taken in combination, the Trust's behavior supports inferences that (i) the Trust failed to produce relevant documents that Terramar requested in a timely manner in compliance with the scheduling order; (ii) for purposes of its initial production, the Trust selectively produced documents favorable to the Trust; and (iii) the Trust's belated production contained documents that the Trust should have produced by the substantial completion date. The content of the initial production supports these concerns. Terramar has represented that the initial production did not contain (i) any documents related to the contractual appraisal process to determine Fair Market Value, (ii) the Trust's 2016 response to Terramar's exercise of its Put Right, (iii) any other documents related to the exercise of the Put Right, or (iv) any documents supporting the Trust's assertion that the Company could have obtained an extension of the Seaport Village lease beyond 2018.

The magnitude of the Trust's conduct threatens to taint the fairness of this proceeding if its goes unaddressed. Terramar has not been able to conduct discovery relating to 98.4% of the Trust's documents. Terramar has not been able to identify witnesses based on these documents. Terramar has not been able to depose anyone about these documents. Highlighting this last fact, the Trust did not engage in its document dump until after Terramar had deposed Cohen, the Trust's principal.

Despite the magnitude of its misconduct, the Trust self-righteously faults Terramar for not meeting and conferring with the Trust about its concerns before filing the motion

*in limine*. In many cases, that would be a legitimate point. But in this case, it would have been futile for Terramar to try.[74] The Trust had refused to engage in productive discussions on other subjects, such as a scheduling order. Moreover, it was impossible for Terramar to have resolved the larger problem of the document dump that it did not yet know about. Most significantly, Terramar made the decision that it was happy to have the Trust take such aggressive positions in discovery, as long as the Trust had to live with the consequences of its decisions. A meet-and-confer session would have made sense if Terramar wanted the Trust to change its unreasonable positions. Terramar wanted to force the Trust to stick to its unreasonable positions.

## B.    The Appropriate Sanctions

"A trial court should take care to impose sanctions tailored to the specific violation and its prompt cure. That includes consideration of the intent of the party opposing discovery, and of whether and to what extent the party seeking discovery has been prejudiced."[75] Terramar has requested an evidence-preclusion order. In the course of

---

[74] *See, e.g.*, *Wachtel*, 239 F.R.D. at 94 (ordering sanctions where party "could not engage in meaningful dialogue to reduce the scope of the documents requested without knowing the total number of documents that existed").

[75] *Rinehardt*, 575 A.2d at 1082; *see also Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) ("[A] pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object.").

evaluating that remedy, I have considered a range of possible sanctions that could be imposed, including both more and less serious alternatives.

Having conducted this analysis, I am convinced that the evidence-preclusion order is a fitting sanction for the Trust's misconduct.[76] In making this determination, I have taken into account "the extent to which [allowing] the evidence would disrupt the orderly and efficient trial of the case" and whether the Terramar would have sufficient time "to absorb the new material" or an "effective opportunity to depose witnesses[.]"[77]

Based on my review of more serious potential sanctions, I believe that Terramar could have requested, and I would have been justified in granting, remedies such as an adverse inference against the Trust or an elevated burden of proof for the Trust's affirmative defenses. These remedies would have recognized that by acting as it did, the Trust prevented Terramar from obtaining discovery that it could have used to defend against the Trust's assertions. By engaging in misconduct, the Trust prevented Terramar from receiving this information in time to use it in discovery, making it easier for the Trust to present unchallenged arguments at trial. The evidence-preclusion order prevents the Trust from using the materials affirmatively, but it does not remedy Terramar's lost opportunity to use the material defensively. An adverse inference or elevated burden of proof would have helped restore the balance. Terramar, however, has not requested these

---

[76] *See* Ct. Ch. R. 37(b)(2)(B).

[77] *See Wachtel*, 239 F.R.D. at 105.

31

remedies, and so I will not impose them. I cite them only for purposes of evaluating the remedy that Terramar has requested.

I do not believe that a milder remedy would administer sufficient medicine. One alternative would be to postpone trial and reopen discovery. That would give Terramar an opportunity to review the belated production, depose new witnesses, and re-depose others. Forcing the Trust to bear the expense of these efforts would help address the resulting prejudice to Terramar, but the Delaware Supreme Court has cautioned that "[t]he rights of litigants who in good faith comply with the court's pretrial discovery procedures should not be jeopardized by litigants who disregard [the] rules."[78] Terramar has sought a prompt trial since filing this litigation in 2016 and secured a right under the scheduling order to a trial in January 2019. Postponing trial would give the Trust exactly what it sought to achieve through its campaign of delay. It would also enable the Trust to continue using the risk of pending litigation to create holdup value in the dissolution process. A do-over would be unfair to Terramar, which has been trying to pursue its contractual exit rights since December 2015. Even if Terramar fails to prove its claims at trial, it deserves an answer one way or the other, and sooner rather than later.

---

[78] *Wahle*, 559 A.2d at 1233.

The appropriate course is to keep the trial dates and remedy the prejudice through the type of evidence-preclusion order that the Terramar has requested. Other courts have entered functionally similar relief.[79]

The motion *in limine* seeks an order precluding the Trust

> from offering evidence at trial on the matters on which it has blocked discovery, including the matters that are the subject of the following discovery requests:
>
> a.     Requests 22, 23, 24, 26, 27, 28, 29, 31, and 33 of Plaintiff's Second Request for the Production of Documents; and
>
> b.     Requests 4 and 11 of Plaintiff's Third Request for the Production of Documents.[80]

Terramar requested this relief based on the Trust's discovery responses. At the time Terramar framed its request, the document dump had not yet occurred.

Although Terramar's request for relief has the basic concept right, the categories are hard to parse. The proposed relief also encompasses the Third Requests, which were not covered explicitly by the substantial completion deadline. There are good reasons to extend the relief to the Third Requests: They were predominantly clean-up requests which sought

---

[79] *See, e.g.*, *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *26 & n.267 (Del. Ch. June 26, 2017) (admitting financial spreadsheets but giving them "no weight" where opposing party "was deprived of the opportunity to take meaningful discovery to test their reliability before trial, and unfairly hamstrung in its ability to cross-examine witnesses about them at trial"); *Chevron v. Donziger*, 296 F.R.D. 168, 224 (S.D.N.Y. 2013) (permitting sanctioned party to introduce belatedly produced documents at trial but reserving right to exclude "materials on a document-by-document basis . . . . as a sanction irrespective of whether they otherwise would have been admissible").

[80] Ex. 90, [Proposed] Order.

to confirm that material had been fully covered by the First and Second Requests, and the Trust did not produce documents separately in response to the Third Requests. The Trust completed its initial production, then a month-and-a-half later inflicted the document dump.

Rather than framing the relief in terms of the specific requests, it is more straightforward at this point to speak in terms of the document dump. These materials arrived inexcusably late, and they likely constitute the additional materials that the Trust hopes to be able to use.

Accordingly, the Trust is barred from entering into evidence any of the documents it produced after the Rule 30(b)(6) deposition conducted on October 16, 2018 (the "Excluded Documents"). So that the Trust cannot avoid potential cross-examination based on the Excluded Documents, Terramar may use the Excluded Documents at trial for the purpose of impeaching witnesses, but only for that purpose.

## C. Expenses

The Trust shall bear the expenses that Terramar incurred bringing the motion *in limine*.[81]

> When a party violates orders of the court—including scheduling orders that require the parties to file papers and make all their arguments at the required

---

[81] The term "expenses" refers collectively both to attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. *See Meyers v. Quiz–DIA LLC*, 2018 WL 1363307, at *1 n.3 (Del. Ch. Mar. 16, 2018).

time—and rules of the court, and thereby exposes its adversary to unnecessary delay and expense, this court has the discretion to shift fees.[82]

Rule 37 provides an independent basis for shifting the expenses because the Trust's conduct was not substantially justified.[83]

### III. CONCLUSION

The motion *in limine* is granted. The parties shall proceed in accordance with the rulings set forth in this decision.

---

[82] *Wimbledon Fund LP–Absolute Return Fund Series v. SV Special Situations Fund LP*, 2011 WL 6820362, at *3 (Del. Ch. Dec. 22, 2011) (Strine, C.).

[83] *See* Ct. Ch. R. 37(a)(4)(A).